ADAMS v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5975. Decided September 20, 1938. (82 P. 2d 693.)

L. *Tom Perry*, of Logan, for plaintiff.

*F. A. Trottier*, of Salt Lake City, for defendants.

HANSON, Justice.

Certiorari to review an order of the Industrial Commission denying compensation to Lyle Adams for injuries sustained in the course of his employment by the Utah State Agricultural College at Logan, Utah.

There is no conflict in the evidence which is that at and prior to the time of the injury, plaintiff was employed as a teamster, drove and cared for his team, hauled hay and manure. Part of his duties was to curry his team and occasionally to roach their manes, which consisted of trimming them with sheep shears. In so doing, the pieces of horsehair so trimmed off, in pieces from an eighth of an inch or less to an inch long or over, would fall and be scattered, some of it over his hand, arm, face and clothing. He wore a woolen sweater while at work and in going to and coming home from work, which was pulled off on reaching home and put on again when he was leaving in the morning. Particles of the horsehair fell upon and penetrated this sweater and accumulated at certain places in the garment. The team he drove was a white or grey team with white hair. On either the day before the accident, or two or three days before, he had roached the manes of his team and in the interim had engaged in the hauling of hay and manure. In this work it was his practice to rest his forearm on his knee or thigh to aid in the leverage required to lift the loaded fork. On the morning of April 2, 1937, at about 8 o'clock a. m., while currying and harnessing his team, he noticed an irritation at a point on his right forearm a few inches above his wrist joint, which felt like a small sliver sticking

out of his arm and rubbing against the sleeve of his sweater. He paid no immediate attention to it until between 9 and 10 o'clock a. m. when it became more sore and he stopped to observe it more closely. It was then a small white pimple and he saw a short piece of white horsehair sticking out of the pimple. He pulled it out with his fingers, looked at it, and threw it away and resumed his work. It was a similar particle of horsehair to those he had clipped from his horses' manes. The forearm kept getting more sore about the pimple as the day wore on and the inflammation spread. He reported it during the day to his foreman, Mr. Smith. When he was unharnessing his team at quitting time that night his arm had become so sore he could scarcely lift the harness to hang it on the pegs. Next morning he was so sick he could hardly get out of bed. Dr. Randall was called and treated him for the injury. He then had a case of blood poison, spreading from the point of the injury on his right forearm. The poisonous infection is described in medical parlance as "hemolytic streptococcus," the germ of which is very prevalent about barns and stables. The medical testimony is that it is a very virulent poison and develops rapidly, within 24 to 48 hours after its penetration through a wound or opening in the skin of a person. From the appearance of the wound and its development the physicians say it must have been caused by the horsehair, and the infection penetrated the skin of Adams' arm through the opening made thereby. The history of the case affords no other reasonable explanation.

The applicant was not exposed to or around any other fur-bearing animals at the time or within the period of infection, or while working at the college. When Dr. Randall first saw him on the morning of April 3, 1937, about 9 o'clock a. m. he had a high temperature (104 degrees) and the infection was spreading from the point of the pimple in his right forearm, about two and one-half inches above the wrist joint. No evidence of any other focal infection at any other point in his body was found during the general examination of

him. He gave appropriate treatments, rest, hot fomentations, anodyne for the pain, and acidine tablets. His condition grew worse and became critical; he was taken to the hospital on April 5th, given anesthetics, and the arm was opened in four places to introduce antiseptics and drains. He was discharged at length from the hospital on May 10th and taken to his home where he remained under treatment until his recovery in August following. Medical and hospital bills were incurred aggregating $543 besides nursing bills.

On cross-examination Dr. Randall was asked as to the possibility of the infection having come from some other source than the horsehair opening, or from the hair itself. He answered he could see no reasonable hypothesis for such an assumption, or that it was due to the entrance of any other agent, or occurred in any other manner than as described in the testimony, and while Adams was at work with the horses. This particular type of infection does not come from human beings. As a rule, a man does not infect himself with streptococcus.

The testimony of Dr. C. J. Daines, based upon hypothetical questions, corroborated that of Dr. Randall regarding the nature and origin of the poisonous infection in Adams' arm. From the testimony he concluded that the horsehair had lodged in Adams' sweater and by his work had penetrated his arm. He further testified that such a poison develops rapidly; in one instance in his knowledge the injured person was dead within 48 hours. In other cases a high state of inflammation developed within 24 hours. The streptococcus infection works rapidly and is much dreaded. It is prevalent around barns. From his experience he would say the infection began shortly before Adams first felt the soreness in his arm. He thinks it entered the arm that morning. It was the infection that drew his attention to it rather than the hair itself.

There was no countervailing testimony to that above stated, in substance. Yet the Industrial Commission found

that the applicant was not injured by accident arising out of or in the course of employment, and denied compensation. We are unable to reconcile the finding and action of the Commission with the evidence in the case. The necessity for evidential support for its findings and orders arises from the fact that the members of the Commission cannot possibly be present at the time and place of each accidental injury upon the facts of which they must pass in allowing or denying compensation, and from the further fact that the statute ordains a hearing in each case so that they may ascertain the facts from the testimony of those who were present and have personal knowledge. To repudiate this means of access to knowledge of the facts from those who know the facts first hand, is to close their eyes to the facts, and to base official action upon conjecture. This the law forbids as unreasonable, capricious, and in excess of jurisdiction.

The testimony upon which the Commission was called to act was not that of the applicant alone. His was the principal testimony as to the circumstances immediately attending and preceding his discovery of the horsehair sticking from the pimple in his arm, inflammation spreading therefrom, and the subsequent course of the dangerous infection. But his testimony was supported by adequate corroboration as to the controlling facts from other and disinterested witnesses. The undisputed evidence meets all the requirements of the rule supporting an award as announced in our previous decisions, and is open to none of the grounds for discrediting the applicant's testimony.

In the case of *Kavalinakis* v. *Industrial Commission*, 67 Utah 174, 246 P. 698, we say [page 702]:

"If the order * * * refusing an award is against the undisputed competent evidence demanding it, the order in neither instance can be upheld. * * *

"Notwithstanding the commission as to this, like a jury, is the sole judge of the facts, the credibility of witnesses, and the weight to be given to their testimony, nevertheless, it, like a jury, is required to take as true undisputed or uncontradicted evidence, if not opposed

to probabilities or common knowledge, or contrary to natural or physical laws, or inherently improbable, or inconsistent with circumstances in evidence, or contradictory in itself, or does not from the very nature of things come from witnesses directly interested, and it is impossible to secure opposing testimony, or where the witnesses from whom comes the evidence are impeached or otherwise discredited."

And the rule we stated in *Norris* v. *Industrial Commission of Utah*, 90 Utah 256, 61 P. 2d 413, is pre-eminently applicable in this case. It was there stated [page 415]:

"Where the matter presented on appeal is the question of whether the commission should have in law arrived at a conclusion of fact different from that at which it did arrive from the evidence, a question of law is presented only when it is claimed that the commission could only arrive at one conclusion from the evidence, and that it found contrary to that inevitable conclusion. But in order to reverse the commission in this regard it must appear at least that (a) the evidence is uncontradicted, and (b) there is nothing in the record which is intrinsically discrediting to the uncontradicted testimony and (c) that the uncontradicted evidence is not wholly that of interested witnesses or, if the uncontradicted evidence is wholly or partly from others than interested witnesses, that the record shows no bias or prejudice on the part of such other witnesses, and (d) the uncontradicted evidence is such as to carry a measure of conviction to the reasonable mind and sustain the burden of proof, and (e) precludes any other explanation or hypothesis as being more or equally as reasonable, and (f) there is nothing in the record which would indicate that the presence of the witnesses gave the commission such an advantage over the court in aid to its conclusions that the conclusions should for that reason not be disturbed.

"If the commission should decide against the uncontradicted evidence under those conditions, its decision would as a matter of law be arbitrary and capricious, which is another way of saying that it would be unreasonable."

The evidence we have summarized meets each of these tests and warrants but one reasonable conclusion, and that one supports the right to compensation.

Contention is made that the streptococcus germ is ubiquitous, not peculiar to stables, may be found everywhere—

around one's home, on his person, clothing, etc., and that the portal of entry in this instance may have been due to some means or agency other than the horsehair. There is no evidence in the record to support the one hypothesis or the other. As to the first, cleanliness, environment, and localities would seem to be important factors. The second is rebutted by the presence of an offending agent in the wound it produced, the two of equal size, and the hair firmly in place therein until removed. The weakness of the imputation of some possible cause of the incision, other than the horsehair, lies not only in the lack of evidence to support it but in the positive evidence of the presence in the wound of an agency competent to produce it, and in surroundings of proved general prevalence of the germ. The germ does not, however, get into the blood stream except through an opening or incision in the skin. Such an opening was provided by the horsehair in Adams' arm. To impute either the wound or the infection to an extraneous cause is to transfer the finding or conclusion from an evidential to a conjectural basis. To do so is unreasonable. As well may this be done where a knife is found sticking in a person's side, the blade fitting snugly into the wound it produced, in a locality reeking with filth. Or, where the fang of an adder or the stinger of a poisonous insect is found sticking from an infected wound in a locality infested with these noxious creatures. Granting that a similar wound and infection could possibly have been produced elsewhere and by other agencies, there is no reasonable basis for an inference that it was so produced in this case. The medical testimony is that "this particular type of infection does not come from human beings." And, "as a rule a man does not infect himself with streptococcus."

There is no support for the Commission's adverse finding in our recent decision in *Sugar* v. *Industrial Commission of Utah*, 94 Utah 56, 75 P. 2d 311, cited to our attention by defendants' counsel. In that case there was no question raised as to the wound being produced by the bullet found in

Sugar's body, nor any contention that it was produced by some other agency instead. The sole question in that case was as to who fired the fatal shot—whether it was fired by the deceased himself with suicidal intent or by a stranger. There were some facts in evidence from which inconclusive inferences either way might have been drawn. We held that the conclusion drawn by the Commission as between the conflicting inferences was not vulnerable on review by this court. Had the question there been whether the wound was produced by the bullet or by some other conjectural agency capable of inflicting a similar wound, of which there was no evidence in fact, and had the Commission found in favor of such conjectural agency as the cause of death, a different question would have been presented. The bullet found in the body must have repelled the conjectural theory.

The order of the Industrial Commission is annulled and the cause remanded for further proceedings.

FOLLAND, C. J., and MOFFAT, WOLFE, and LARSON, JJ., concur.